Filed 6/30/22  P. v. Gallegos CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARK GALLEGOS,<br><br>    Defendant and Appellant. | F082060<br><br>(Super. Ct. No. BF179298A)<br><br><br>**OPINION** |

<u>**THE COURT**</u>[*]

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush and Judith K. Dulcich, Judges.

Francine R. Tone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Doris A. Calandra and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Franson, Acting P. J., Peña, J. and DeSantos, J.

Defendant Mark Gallegos contends on appeal that the evidence presented at his suppression hearing failed to establish that the police officer had legal justification to stop defendant's car.

We also ordered the parties to submit supplemental briefing regarding the impact of Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567), which modified section 1170, subdivision (b), to require imposition of the middle term of imprisonment unless circumstances in aggravation justify imposition of a greater sentence. (Stats. 2021, ch. 731, § 1.3.) It further modified section 1170, subdivision (b), to require that the circumstances in aggravation be found true beyond a reasonable doubt or be stipulated to by defendant. (*Ibid.*) Defendant contends his sentence on count 2 must be vacated and his case remanded for resentencing in light of Senate Bill 567's amendments to section 1170, subdivision (b).

We vacate defendant's sentence and remand for resentencing consistent with the changes brought about by Senate Bill 567. In all other respects, we affirm.

## PROCEDURAL SUMMARY

On December 27, 2019, the Kern County District Attorney filed an information charging defendant with possession of heroin while armed (Health & Saf. Code, § 11370.1, subd. (a); count 1), possession of firearm by a felon (Pen. Code,[1] § 29800, subd. (a)(1); count 2), possession of ammunition by a felon (§ 30305, subd. (a)(1); count 3), transportation or sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 4), possession of methamphetamine (Health & Saf. Code, § 11378; count 5), possession of heroin for sale (Health & Saf. Code, § 11351; count 6), and possession of methamphetamine by a jail inmate (§ 4573.6; count 7). As to counts 1 through 6, the information alleged the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)), and that

---

[1] All subsequent references are to the Penal Code unless otherwise noted.

defendant was personally armed with a firearm in the commission of the offenses charged in counts 4 through 6 (§ 12022, subd. (c)). It was further alleged that defendant had sustained a prior "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)), and a serious felony conviction, within the meaning section 667, subdivision (a).

On January 22, 2020, defendant filed a motion to suppress evidence pursuant to section 1538.5. On March 9, 2020, the trial court denied the motion.

On July 14, 2020, the parties reached a negotiated disposition to amend the information to add a misdemeanor violation of section 186.22, subdivision (a) (count 8), so defendant could plead nolo contendere to counts 2 and 8, with the remaining counts dismissed on the People's motion. Defendant also admitted the prior strike allegation.

On October 8, 2020, the trial court denied defendant probation and imposed the upper term of three years for count 2 (§ 29800, subd. (a)(1)), doubled to six years based on his prior conviction (§ 667, subd. (e)). The trial court imposed a concurrent 180-day term for count 8.

On November 16, 2020, defendant filed a notice of appeal.

## FACTS

Defendant filed a motion to suppress evidence pursuant to section 1538.5, to challenge the initial traffic stop of defendant. The parties stipulated no warrant existed.

At the hearing on the motion, Bakersfield Police Officer Renee Garcia testified that on July 22, 2019, he was driving a patrol car in Kern County when he noticed defendant's vehicle approximately 15 to 20 feet from his. It was 8:30 p.m. and dark outside. Garcia did not remember whether there were streetlights in the area but stated the area was illuminated by lighting from nearby businesses. He observed defendant's windows were "darkly tinted." When asked to describe exactly what he meant by "darkly tinted," Garcia explained he "really couldn't see inside of the vehicle due to the front windows. I could see the outline of the driver; however, I couldn't see any facial

3.

expressions or any facial features." He stated he would not have been able to give a description of the person inside of the vehicle due to the tinting. All the windows had the same tinting except the front windshield. He stated that the windows were darker than he would expect on a normal vehicle.

After pulling defendant's vehicle over, he approached it. While inspecting the vehicle more closely, he again noticed that the windows were so darkly tinted that he could not see clearly inside of the vehicle. He testified that even when he got up close to the window he had trouble viewing the inside of the vehicle from the outside without a door or window open. All he could see was an outline of the vehicle's driver. Only once defendant rolled down his driver's side window could Garcia see defendant's facial features. He testified he could see nothing else of defendant until the window was down, stating, "[b]ecause the windows were so darkly tinted, I wasn't able to make out any facial appearances."

Garcia testified that he never got inside of defendant's vehicle and looked through the windows to the outside.

Garcia stated that once defendant's driver's side window was rolled down, he and his partner, Bakersfield Police Officer Mariya Corral, took photographs of defendant's vehicle. Two photographs of the vehicle were entered into evidence. Garcia testified that both photos were taken from outside of defendant's vehicle, showing the passenger side window rolled up and the driver's side window rolled down, as well as the view through the open driver's side window into the passenger side of the car.

Garcia testified that he had been an officer for six years and had seen vehicles with similar window tinting on previous occasions. He believed the darkly tinted windows were a violation of the vehicle code.

On cross-examination, Garcia stated that the interior of the car was not illuminated when he drove near it and made his initial observation about the windows being darkly

4.

tinted. After it was stopped, he testified that he approached the vehicle with a flashlight and knocked on the window, prompting defendant to roll it down as requested.

On redirect, defense counsel moved to strike the photographs entered as Exhibits 1 and 2, arguing they showed nothing "demonstratively adding to anything to this discussion." The trial court denied defendant's motion to strike, stating, "I disagree. I mean these aren't the best pictures in the world, but I think they show some. So—some evidence. So motion denied."

After hearing Garcia's testimony, the trial court found he made a lawful stop based on his determination that the windows of defendant's vehicle were tinted beyond what the law allows.

## DISCUSSION

### A. Motion to Suppress

Defendant contends his case must be reversed and the charges dismissed because the evidence at the suppression hearing failed to establish that the Garcia had legal justification to stop defendant's car because the officer did not offer specific articulable facts to form a basis for suspecting that the tinted windows fell outside permissible parameters or impaired defendant's vision while driving. The People argue the trial court properly denied defendant's section 1538.5 motion to suppress evidence. We agree with the People.

The police may conduct a traffic stop if the circumstances show a reasonable suspicion that the driver has violated the Vehicle Code or some other law. (*People v. Durazo* (2004) 124 Cal.App.4th 728, 734–735.) A reasonable suspicion requires a showing of specific and articulable facts that would cause a reasonable officer in a like position, drawing on the officer's training and experience, to believe a violation has occurred or is about to occur. (*In re Tony C.* (1978) 21 Cal.3d 888, 893.) Reasonable suspicion is " 'something more than an "inchoate and unparticularized suspicion or 'hunch,' " ' " but something less than the fair probability required for probable cause.

(*People v. Bennett* (1998) 17 Cal.4th 373, 387.)  The courts look at the totality of the circumstances to determine whether there was a " 'particularized and objective basis' " for the officer's suspicion.  (*People v. Butler* (2003) 111 Cal.App.4th 150, 160.)  If an officer reasonably suspected a violation of a traffic law, the stop is lawful even if later investigation dispels that suspicion.  (*People v. Rodriguez* (2006) 143 Cal.App.4th 1137, 1149.)

The Vehicle Code prohibits the placement of material on a window that "obstructs or reduces the driver's clear view" through the window.  (Veh. Code, § 26708, subd. (a)(2).)  Further, the code states that "clear, colorless, and transparent material[,]" designed "to block the sun's harmful ultraviolet A rays[,]" may be affixed to the front side windows if the "material has a minimum visible light transmittance of 88 percent" and the "window glazing with the material applied meets [the federal] … specified minimum light transmittance of 70 percent …."  (Veh. Code, § 26708, subd. (d)(1)–(3); see also Veh. Code, § 26708.5.)

With respect to traffic stops for tinted windows, the mere fact of tinting cannot alone support a reasonable suspicion; rather, there must be "additional articulable facts suggesting that the tinted glass is illegal …."  (*People v. Butler* (1988) 202 Cal.App.3d 602, 607; *People v. Hanes* (1997) 60 Cal.App.4th Supp. 6, 9–10 (*Hanes*).)  However, the courts also recognize that when enforcing the tinted window statute, officers need not be "scientists or carry around and use burdensome equipment to measure light transmittance"; rather, "based upon their training and experience with vehicles in general, [they] will be able to examine a suspect vehicle, look through the windows if possible, and form an opinion as to whether or not the tinting" violates the statute.  (*People v. Niebauer* (1989) 214 Cal.App.3d 1278, 1292.)

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found,

6.

the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Here, we defer to the trial court's factual findings, as they are supported by sufficient evidence. In light of these findings, we agree with the People that Garcia's stop of defendant was reasonable under the Fourth Amendment. The record shows specific articulable facts that support Garcia's reasonable suspicion that defendant's vehicle's windows were illegally tinted.

Garcia testified defendant's vehicle's windows were "darkly tinted;" he could not see anything but the outline of defendant through the driver's side window even when he was up close to it, and only once the window was rolled down could he see defendant's facial features. He stated that during his six years of experience as a police officer he had seen numerous cars with similar tint to defendant's vehicle. Based on these observations, he assessed defendant's window tinting was in violation of the Vehicle Code.

These circumstances showed more than the mere existence of tinting, and justified a stop based on a reasonable suspicion formed by Garcia based upon specific articulable facts that the tint failed to comply with the clear view and light transmittance standards defined in the Vehicle Code. (*Hanes*, *supra*, 60 Cal.App.4th at p. Supp. 10 [the officer reasonably stopped vehicle for window tint that "was so dark as to appear black and prevent the officer from seeing the occupants of the front seats"]; *United States v. Wallace* (9th Cir. 2000) 213 F.3d 1216, 1217, 1220–1221 [officer reasonably stopped vehicle for " 'heavy tint' " that made it difficult to view occupants inside].)

Defendant asserts the circumstances did not show a reasonable suspicion because Garcia only observed the view through the windows from the outside of defendant's vehicle, and he did not know what the driver's view was from the inside of the car. The contention is unavailing because an officer observing a vehicle's windows prior to a stop will typically only have a view from the outside of the car. (*Hanes*, *supra*, 60 Cal.App.4th Supp. at pp. Supp. 8, 10 [officer reasonably stopped vehicle for tint after he

observed vehicle's window tinting as it drove by him in an intersection at 10 to 15 miles per hour].) The reasonable suspicion standard for a traffic stop is satisfied by this outside observation, even if further investigation ultimately determines the driver's clear view was not in fact reduced.

Defendant also argues that because it was dark at the time of the stop and he was 15 to 20 feet away from defendant's vehicle, it was not possible for Garcia to view the interior of the car regardless of any window tinting. Although he testified that it was dark when he stopped defendant and the area was illuminated by nearby buildings, Garcia stated he was able to observe that the windows were "darkly tinted" and could not see anything but an outline of the vehicle's occupants, even when he got up close to the window after it was stopped. The trial court was entitled to credit this testimony, and to infer that even at night Garcia was able to ascertain that the view into the car was obstructed due to the window tinting. (See *Hanes*, *supra*, 60 Cal.App.4th at pp. Supp. 8, 10 [officer reasonably stopped vehicle for tint at night].) We defer to this factual determination.

Defendant further challenges the reasonable suspicion finding because the prosecution did not present evidence of the actual measurement of the tint, and argues the photographs depicting the tinted windows do not support Garcia's testimony. This evidence was not necessary to establish Garcia's reasonable suspicion at the time of the stop. Garcia's testimony describing the tint and his evaluation of the tint based on his training and experience was sufficient to show the reasonableness of the traffic stop. The trial court also addressed the photographs, stating they showed "some evidence" and it was entitled to make that factual determination.

Garcia did not testify to the mere fact of tinting of the windows. He testified to specific articulable facts on which he relied in forming his reasonable suspicion that defendant's vehicle's window tinting was in violation of the Vehicle Code, making Garcia's stop of defendant reasonable under the Fourth Amendment.

8.

**B. Senate Bill 567**

Defendant contends the trial court's sentence to the upper term on count 2 be vacated and remanded for resentencing in light of Senate Bill 567's amendments to section 1170, subdivision (b). The People argue that although Senate Bill 567's amendments to section 1170, subdivision (b) apply here, vacating defendant's sentence and remanding the case for resentencing is unnecessary because defendant's sentence to the upper term in count 2 was a stipulated sentence agreed to by defendant as a term of his plea bargain, and alternatively, that defendant's *Harvey*[2] waiver allowed the trial court to rely on facts of the dismissed counts that were not proven beyond a reasonable doubt. They further contend that if the case is remanded and the trial court imposes anything other than that which is specified in the plea agreement, the People must be given the opportunity to withdraw from the plea agreement. We remand defendant's case for resentencing.

### *I. Background*

Defendant's six-year sentence was a specified term of the negotiated plea agreement between defendant and the prosecution. On July 14, 2020, defendant signed a change of plea form. The plea agreement provided that defendant would "plea to 29800 x. 2 = 6 yrs total [and section] 186.22[, subd. ](a)/17(b) … concurrent." The trial court stated,

> "I have a [w]aiver of [r]ights form indicating [defendant] will enter a change of plea to [c]ount 2, admit the strike, and a plea to [c]ount 8, amended … section 186.22[, subd. ](a), section 17, for upper term times two on [c]ount [2],[3] which is six years total. The misdemeanor will be concurrent. All remaining charges are dismissed."

---

**2**  *People v. Harvey* (1979) 25 Cal.3d 754.

**3**  The trial court mistakenly stated "[c]ount 1," when stating that defendant was sentenced to the upper term, but the count for which he received this sentence was count 2. Count 1 was dismissed, per the terms of defendant's plea agreement.

The trial court asked defendant if its statement reflected his "understanding of what is going to happen." Defendant confirmed that it was. Defendant pled no contest to count 2, admitted the prior strike, and pled no contest to amended count 8. The probation "Short Report" reflected the "Conditions of Plea," stating: "The defendant pled to six years in state prison. Remaining counts dismissed; allegations stricken."

There is no record of a trial court finding of aggravated circumstances or defendant's stipulation of the same.

## II. Retroactivity

On October 8, 2021, Senate Bill 567 was signed into law. It amends the determinate sentencing law, section 1170, subdivision (b), which delineates the trial court's authority to impose one of three statutory terms of imprisonment, known as the lower, middle, or upper terms, by making the middle term the presumptive sentence for a term of imprisonment, unless certain circumstances exist. (See Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2).) Under the newly amended law, the trial court may impose an upper term sentence only where there are circumstances in aggravation, and the facts underlying all of the aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or a judge in a court trial. (*Ibid.*) Also, under section 1170, subdivision (b)(3), the trial court, "may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).) Under amended section 1170, subdivision (b)(5), the trial court must "set forth on the record the facts and reasons for choosing the sentence imposed. The court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law."

Senate Bill 567 went into effect on January 1, 2022. Absent evidence to the contrary, the Legislature intends amendments to statutes that reduce the punishment for a particular crime to apply to all defendants whose judgments are not yet final on the

amendment's operative date. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307–308 [discussing *In re Estrada* (1965) 63 Cal.2d 740]; *People v. Brown* (2012) 54 Cal.4th 314, 323.) The "consideration of paramount importance" is whether the amendment lessens punishment. (*Estrada*, at p. 744.) If so, the "inevitable inference [is] that the Legislature must have intended that the new statute" apply retroactively. (*Estrada*, at p. 745.) As Senate Bill 567's amendments to section 1170, subdivision (b), lessen punishment, and there is no indication that the Legislature intended it to apply prospectively only, the new law must be retroactively applied. Therefore, the amendment to section 1170, subdivision (b), applies to all cases not final on Senate Bill 567's effective date. (*Estrada*, at pp. 745–746; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

As defendant contends, his case was not final on January 1, 2022, and he was sentenced to the upper term on count 2 under former section 1170. We agree. Defendant is entitled to the benefit of Senate Bill 567. Here, defendant's sentence to the upper term on count 2 by the trial court is not consistent with the requirements of Senate Bill 567's amendment to section 1170, subdivision (b), because the record does not reflect that the trial court relied upon certified records of defendant's prior convictions, and because the trial court did not state that it relied on aggravating factors admitted by defendant or proved beyond a reasonable doubt.

### III. *Negotiated Plea Agreement with Stipulated Sentence*

The People contend that section 1170, subdivision (b)(2), applies only when the trial court's discretion is not restrained by a negotiated plea agreement pursuant to section 1192.5. The People rely on *People v. Brooks* (2020) 58 Cal.App.5th 1099 (*Brooks*), reasoning that when a plea agreement stipulates that the upper term be imposed, the trial court exercises no discretion and may not make the finding required by section 1170, subdivision (b)(2).

11.

In *Brooks*, the defendant entered a plea agreement that stipulated to a 19 year eight month sentence.  (*Brooks*, *supra*, 58 Cal.App.5th at p. 1102.)  The defendant petitioned the trial court to be resentenced, pursuant to recently enacted section 1170.91, subdivisions (a) and (b)(1), which, collectively, required the trial court to consider specific mental health problems as circumstances in mitigation when sentencing military veterans and permitted military veterans with such problems to petition for a recall of sentence.  (*Brooks*, at pp. 1102–1103; § 1170.91, subds. (a) & (b)(1); see § 1170.91 ["court shall consider the [identified] circumstance as a factor in mitigation when imposing a term under subdivision (b) of [s]ection 1170"].)  The trial court concluded that it had no power to resentence the defendant because his plea agreement provided for a stipulated term.  (*Brooks*, at p. 1103.)  The trial court affirmed, concluding that section 1170.91 does not "extend[] to sentences based on final convictions by plea agreement specifying a stipulated imprisonment term."  (*Brooks*, at p. 1106.)  The court explained that there was no "triad sentencing discretion to exercise" because the plea agreement specified the sentence to be imposed and, pursuant to section 1192.5, no other sentence could properly be imposed.  (*Brooks*, at p. 1107.)

The *Brooks* court distinguished the case from *People v. Stamps* (2020) 9 Cal.5th 685 (*Stamps*), where the court was required to apply a retroactive ameliorative change in the law that provided new discretion to dismiss an enhancement (see § 1385; *Brooks*, *supra*, 58 Cal.App.5th at p. 1107.)  In *Brooks*, however, section 1170.91 did not "grant the trial court unfettered discretion to reconsider an aspect of his sentence that would in turn affect his plea bargain.  All it [did was] allow a court to take certain mitigating factors into account, and only insofar as the court is otherwise permitted to exercise discretion in the selection of a low, middle, or high term from within the applicable sentencing triad."  (*Brooks*, at p. 1107.)

*Brooks* is not controlling here.  Section 1170.91 does not parallel section 1170, subdivision (b)(1) and (2).  The amendment to section 1170, subdivision (b)(2), does not

12.

merely require the trial court to consider additional factors in reaching a trifecta determination; it *precludes* the trial court from imposing the upper term unless it finds "there are circumstances in aggravation of the crime that justify the imposition of" the upper term. Indeed, section 1170, subdivision (b)(1), requires such a finding any time "the statute specifies three possible terms." In other words, section 1170, subdivision (b)(1) and (2) requires trial courts to determine whether the circumstances in aggravation of the crime justify the imposition of a term of imprisonment exceeding the middle term. While the parties may stipulate to the existence of facts that support such a determination, they cannot, by negotiated plea agreement, obviate the need for the trial court to make the required determination.

Accordingly, the fact that defendant's sentence to the upper term for count 2 was a term of his negotiated plea agreement does not negate the requirements of amended section 1170, subdivision (b). The trial court stated that it was sentencing defendant to the upper term based solely on the fact that the sentence was a term of defendant's negotiated plea agreement. It did not state that it relied upon any aggravating factors when sentencing defendant to the upper term for count 2. Accordingly, defendant's sentence does not meet the requirements of section 1170, subdivision (b), as amended by Senate Bill 567, and must be vacated and remanded for resentencing.

### IV. *Harvey Waiver*

The People alternatively relies on *People v. Munoz* (2007) 155 Cal.App.4th 160 (*Munoz*) to contend that by signing the plea agreement that included defendant's initialed *Harvey* waiver, defendant "effectively 'stipulate[d] to the relevant facts' necessary to impose the upper term, thereby waiving his right to have a jury trial and proof beyond a reasonable doubt on those facts." (See *Munoz*, *supra*, 155 Cal.App.4th at p. 168, quoting *Blakely v. Washington* (2004) 542 U.S. 296, 310 (*Blakely*).)

In imposing the defendant's sentence pursuant to a plea bargain, the California Supreme Court held in 1979 in *Harvey* that the court may not consider evidence of any

crime as to which charges were dismissed as a circumstance in aggravation to support the upper term on the remaining count or counts. (*People v. Harvey*, *supra*, 25 Cal.3d at p. 758.) The court reasoned it was "improper and unfair" to permit the sentencing court to consider any facts underlying dismissed counts because implicit in a plea bargain is the understanding the defendant will not suffer adverse consequences stemming from the dismissed counts. (*Ibid*.) "To avoid the *Harvey* restriction, prosecutors often 'condition[] their plea bargains upon the defendant agreeing that the sentencing court may consider the facts underlying the not-proved or dismissed counts when sentencing on the remainder.' " (*Munoz*, *supra*, 155 Cal.App.4th at p. 167.)

*Apprendi v. New Jersey* (2000) 530 U.S. 466 held with respect to the Sixth Amendment that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id*. at p. 490.)

Four years after *Apprendi*, the high court held in *Blakely*, *supra*, 542 U.S. 296, "the statutory maximum is the maximum sentence a court could impose based solely on facts reflected by a jury's verdict or admitted by the defendant; thus, when a court's authority to impose an enhanced sentence depends upon additional factfindings, there is a right to a jury trial and proof beyond a reasonable doubt on the additional facts." (*Munoz*, *supra*, 155 Cal.App.4th at p. 166; see *Blakely*, *supra*, 542 U.S. at pp. 303–305.)

Three years after *Blakely*, however, the United State Supreme Court held that "[b]ecause [California's determinate sentencing law (DSL)] allocates to judges sole authority to find facts permitting the imposition of an upper term sentence, the system violates the Sixth Amendment." (*Cunningham v. California* (2007) 549 U.S. 270, 293 (*Cunningham*), overruling *People v. Black* (2005) 35 Cal.4th 1238 on this point, vacated in *Black v. California* (2007) 549 U.S. 1190.) The *Cunningham* court explained "California's DSL, and the Rules governing its application, direct the sentencing court to start with the middle term, and to move from that term only when the court itself finds

and places on the record facts—whether related to the offense or the offender—beyond the elements of the charged offense." (*Cunningham*, at p. 279.) Applying *Apprendi* and *Blakely*, the court concluded the middle term under the DSL was the maximum term that could be imposed on the basis of the jury's verdict alone. (*Id*. at p. 288.) Since the DSL exposed a defendant to an upper term based on facts not found by a jury beyond a reasonable doubt, the law violated a defendant's Sixth Amendment right to a jury trial where the upper term was imposed. (*Id*. at p. 281.)

As a result of *Cunningham*, the California Supreme Court had occasion to consider whether a Sixth Amendment violation under *Cunningham* in the imposition of an upper term sentence was harmless. (*People v. Sandoval* (2007) 41 Cal.4th 825, 838–843 (*Sandoval*).) The *Sandoval* court held that "if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury," the error is harmless. (*Id*. at p. 839; see *People v. Osband* (1996) 13 Cal.4th 622, 728 [single aggravating factor is sufficient to support an upper term].)

Meanwhile, in response to *Cunningham*, California's Legislature amended the DSL through urgency legislation effective March 30, 2007. (Stats. 2007, ch. 3, § 2.) The amended DSL, former section 1170, did away with a presumptive middle term and left "the choice of the appropriate term" to the "sound discretion of the court." (§ 1170, former subd. (b); Stats. 2007, ch. 3, § 2.) At the time defendant here committed the offense for which he pleaded no contest and at the time of sentencing, former section 1170 provided "the choice of the appropriate term shall rest within the sound discretion of the court" which "best serves the interests of justice." (§ 1170, former subd. (b); Stats. 2015, ch. 378, § 1.) This had the effect of making the upper term the statutory maximum for purposes of the Sixth Amendment.

15.

Against this legal backdrop, and about two months after the decision in *Sandoval*, *Munoz* was decided. There, the court held the imposition of an upper term sentence did not violate the defendant's right to a jury trial in light of the defendant's *Harvey* waiver and his effective stipulation to relevant facts throughout the sentencing proceedings. (*Munoz*, *supra*, 155 Cal.App.4th at p. 168.) The defendant had pled no contest to one offense and admitted a firearm enhancement in exchange for the dismissal of numerous other counts and enhancements. (*Id*. at p. 162.) The defendant's plea agreement specifically included a broadly worded *Harvey* waiver that permitted the sentencing court to consider all the underlying facts of the case, including those related to dismissed counts and enhancements, when determining the appropriate sentence for the offense the defendant stood convicted. (*Id*. at pp. 165–167.) The defendant was sentenced to the upper term for both his offense and the firearm enhancement. (*Id*. at p. 165.) On appeal, the defendant argued that his upper term sentence violated the Sixth Amendment under *Cunningham*. (*Id*. at p. 166.)

In rejecting the defendant's argument, the *Munoz* court explained all of the aggravating factors cited by the trial court were encompassed in the defendant's *Harvey* waiver, which permitted the court to consider the entire background of the case, the dismissed or stricken charges or allegations and the defendant's criminal history when imposing the sentence. (*Munoz*, *supra*, 155 Cal.App.4th at p. 168.) Reviewing the facts contained in the probation report, those the defendant admitted to the probation officer, and those contained in the defendant's sentencing brief, the court concluded the defendant had effectively stipulated throughout the sentencing proceedings to the relevant facts necessary to impose the upper term, thereby waiving his right to have a jury trial and proof beyond a reasonable doubt on those facts. (*Ibid*.)

However, as stated above, Senate Bill 567 amended section 1170 effective January 1, 2022, once again making the middle term presumptive—as it was when *Cunningham* was decided. Specifically, pursuant to Senate Bill 567, section 1170 now

16.

provides that the court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term …." (§ 1170, subd. (b)(2); Stats. 2021 ch. 731, § 1.3.) Consistent with *Apprendi*, *Blakely* and *Cunningham*, section 1170 also now requires that aggravating facts used to impose an upper-term sentence, with the exception of prior convictions, must be found by a jury beyond a reasonable doubt or admitted or stipulated to by the defendant. (§ 1170, subd. (b)(2)–(3).) Thus, imposing an upper term sentence based on aggravating facts neither found by a jury to be proven beyond a reasonable doubt nor admitted, stipulated to by the defendant, or proven by certified records of prior convictions, implicate both the Sixth Amendment and consonant new state law requirements under Senate Bill 567.

We decline to extend *Munoz*'s conclusion with respect to the *Harvey* waiver to the particular circumstances of this case. *Munoz* involved consideration of the Sixth Amendment only—it did not consider the implications of a *Harvey* waiver in the context of Senate Bill 567. *Munoz* relied on the statement in *Blakely* that " '[w]hen a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding.' " (*Munoz*, *supra*, 155 Cal.App.4th at p. 166.) The court effectively construed the *Harvey* waiver to encompass a consent to judicial factfinding for purposes of the Sixth Amendment under *Blakely*.

When defendant entered a *Harvey* waiver in this case, the Legislature had cured the DSL's Sixth Amendment deficiencies under *Cunningham* and there was no jury trial right with respect to aggravating facts used to impose the upper term. In this context, defendant's *Harvey* waiver could not have been understood to include a waiver of a jury trial right that definitively was not implicated at the time his plea was entered. And, in fact, defendant did not initial the *Blakely* waiver on his plea form that specifically dealt with jury trial rights. Additionally, the *Harvey* waiver cannot be construed as a

stipulation to aggravating facts or to judicial factfinding of those facts regardless of any subsequent ameliorative changes in the law restricting how those facts may be considered at sentencing—i.e., Senate Bill 567. In other words, the *Harvey* waiver cannot be construed to waive future changes in the law that apply retroactively. (See § 1016.8, subd. (a)(1) ["That the parties enter into a plea agreement does not have the effect of insulating them from changes in the law that the Legislature has intended to apply to them."].) We cannot agree the *Harvey* waiver here had the effect of waiving defendant's Sixth Amendment jury trial rights or the new limitations under Senate Bill 567 for considering aggravating facts to impose an upper term sentence.

### V. Remedy

Because defendant's case is not yet final on appeal and the trial court did not make the determination required under section 1170, subdivision (b)(1), we must determine the appropriate remedy. For the following reasons, we conclude that we must remand the matter to permit the trial court to make the required determination. If the trial court does not conclude that there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, it cannot impose the upper term. We are cognizant that under the terms of the plea agreement, no term other than the upper term may be imposed. The only remedy left in that situation is for the trial court to withdraw approval for the plea agreement and return the parties to the status quo ante.

In *People v. Flores* (2022) 77 Cal.App.5th 420 (*Flores*), review granted June 22, 2022, S274561, this court discussed the appropriate remedy when an ameliorative change in law undermines a plea agreement by requiring imposition of a sentence other than the sentence required by a negotiated plea agreement. Specifically, Assembly Bill No. 1950 (2019–2020 Reg. Sess.) (Assembly Bill 1950), as applicable to *Flores*, required that misdemeanor terms of probation not exceed one year but the negotiated plea agreement required that defendant be granted a three-year term of misdemeanor probation. (*Id*. at

p. 429.)  Assembly Bill 1950 was undisputedly retroactive pursuant to *Estrada.*
However, we explained that "[a]s stated in *Stamps*, [*supra*, 9 Cal.5th 685], '[t]he *Estrada*
rule only answers the question of *whether* an amended statute should be applied
retroactively.  It does not answer the question of *how* that statute should be applied.' "
(*Id.* at p. 432.)  How the statute should be applied is a question of legislative intent.
(*Ibid.*)

In *Flores*, we outlined basic principles of plea bargaining and our Supreme
Court's decisions in *People v. Collins* (1978) 21 Cal.3d 208 (*Collins*), *Harris v. Superior
Court* (2016) 1 Cal.5th 984 (*Harris*), and *Stamps*, *supra*, 9 Cal.5th 685.  We distilled the
following principles relevant to this matter.  First, a defendant sentenced pursuant to a
negotiated plea agreement is not excluded from the benefits of ameliorative changes in
the law (*Flores*, *supra*, 77 Cal.App.5th at p. 438); however, in applying an ameliorative
change in the law, " 'the court is not authorized to unilaterally modify the plea agreement
by striking [portions of the sentence] but otherwise keeping the remainder of the
bargain[,]' " absent legislative intent to the contrary (*Flores*, *supra*, at p. 440, quoting
*Stamps*, at p. 707).  Second, when external events, such as an ameliorative change in the
law undermine a plea agreement, the court " 'must fashion a remedy that restores to the
state the benefits for which it bargained *without depriving* [*the*] *defendant of the bargain
to which he remains entitled.*' "  (*Flores*, *supra*, at p. 435, quoting *Collins*, at p. 216.)
Third, in fashioning a remedy where the plea is undermined by an ameliorative change in
law (as opposed to an ameliorative change in the law merely granting the trial court
additional discretion), the defendant may not be subjected "to more severe punishment
than under the plea agreement." (*Flores*, *supra*, at p. 436, citing *Harris*, at pp. 989–990.)

As we highlighted in *Flores*, the appropriate remedy when an ameliorative change
of law impacts a stipulated sentence imposed pursuant to a negotiated plea agreement can
take many different forms as demanded by the text and intent of the legislation at issue
and the need to maintain the reciprocal benefits imparted by the plea agreements.  In

*Collins*, the defendant pled guilty to an offense in exchange for dismissal of 14 other counts. (*Collins*, *supra*, 21 Cal.3d at p. 211.) The defendant's crime of conviction was decriminalized but the defendant was nevertheless sentenced pursuant to the plea agreement. (*Id.* at pp. 211–212.) Our Supreme Court concluded that the proper remedy was permitting revival of one or more of the 14 counts dismissed pursuant to the plea agreement "but limiting [the] defendant's potential sentence …[,]" not to exceed the sentence originally imposed. (*Collins*, *supra*, 21 Cal.3d at p. 216; *Flores*, *supra*, 77 Cal.App.5th at p. 435.)

In *Harris*, the ameliorative change in law (Proposition 47) modified the offense to which the defendant pled guilty pursuant to a plea agreement from a felony to a misdemeanor but left unaffected the felony charges dismissed pursuant to the plea agreement. (*Harris*, *supra*, 1 Cal.5th at p. 988; *Flores*, *supra*, 77 Cal.App.5th at p. 435.) The legislation explicitly applied to plea agreements, was intended to reduce the number of nonviolent offenders in state prison, and provided a specific " 'safety valve' "— permitting courts to decline relief if it " 'would pose an unreasonable risk of danger to public safety.' " (*Harris*, at pp. 991–992; *Flores*, at p. 436.) The *Harris* court therefore found that the intent of the electorate was to allow modification of plea agreements without affording the People an opportunity to withdraw from the plea agreement; to do otherwise would frustrate the intent of the electorate. (*Harris*, at p. 992; *Flores*, at p. 446.)

In *Stamps*, the defendant was sentenced pursuant to a negotiated plea agreement to a stipulated nine-year term, five years of which were imposed for a then-mandatory enhancement. (*Stamps*, *supra*, 9 Cal.5th at p. 692; *Flores*, *supra*, 77 Cal.App.5th at p. 437.) While the matter was pending on appeal, the ameliorative change in law (Senate Bill No. 1393 (2017–2018 Reg. Sess.)) granted the court discretion to strike the five-year enhancement. (*Stamps*, at p. 692; *Flores*, at p. 437.) "*Stamps* concluded that '[n]othing in the language and legislative history of [the ameliorative change in law] suggests an

20.

intent to modify section 1192.5's mandate that "the court may not proceed as to the plea other than as specified in the plea" without the consent of the parties. … [T]o allow the [trial] court to strike the … enhancement [affected by the change in law] but otherwise retain the plea bargain[] would frustrate the Legislature's intent ….' " (*Flores*, at p. 440, quoting *Stamps*, at p. 704.) Nevertheless, because the trial court lacked the discretion to strike the five-year enhancement at the time of sentencing, the *Stamps* court concluded that the defendant must be permitted an opportunity to seek the trial court's exercise of its newly granted discretion. (*Stamps*, at p. 707.) Although the trial court could not unilaterally modify the plea agreement, if it was inclined to exercise its newly granted discretion, it could withdraw approval for the plea agreement and restore the parties to the status quo ante. (*Ibid*.)

Finally, in *Flores*, we examined the text, legislative intent, and context of Assembly Bill 1950. Assembly Bill 1950 was not expressly retroactive to final judgments like the ameliorative change in law at issue in *Harris*. (*Flores*, *supra*, 77 Cal.App.5th at p. 440.) But, given the *Estrada* presumption and the absence of legislative intent to the contrary, it was retroactive to cases not yet final on appeal.[4] (*Id*. at p. 443.)

---

[4] The legislative intent behind Assembly Bill 1950 "reflects, at bottom, concern 'that lengthy probationary periods do not serve a rehabilitative function and unfairly lead to reincarceration for technical violations.' " (*Flores*, at p. 445.) The legislation was underpinned by research showing " 'that probation services, such as mental health care and addiction treatment, are most effective during the first 18 months of supervision,' " and " 'that providing increased supervision and services earlier reduces an individual's likelihood to recidivate.' " (*Ibid*.) In *Flores*, we further noted that the majority of criminal cases—probably " 'between 80 and 90 percent … are disposed of by guilty pleas …, which, in the majority of cases, are the product of plea bargains.' " (*Ibid*.) In light of the legislative intent and the fact that most criminal cases are disposed of by plea bargains, we concluded that Assembly Bill 1950 was retroactive to all cases not yet final on appeal. (*Ibid*.)

We explained that the remedy in *Stamps* was not applicable to Assembly Bill 1950 cases because the *Stamps* court "addressed an additional concern not" at issue in *Flores*. (*Flores*, *supra*, 77 Cal.App.5th at p. 448.) The ameliorative change in law in *Stamps* "did not directly modify a term of the parties' plea bargain, unlike Assembly Bill 1950[,]" at issue in *Flores*. (*Ibid*.) "Rather, it merely afforded the defendant the opportunity to ask the trial court to exercise" its newly granted discretion to strike the five-year enhancement. (*Ibid*.) "The defendant in *Stamps* sought more than the relief to which he was entitled …; should he succeed in persuading the court to strike the [five-year] enhancement …, he also wanted to maintain the rest of his plea bargain. The effect of this is a request that the trial court modify a term of the plea bargain, unilaterally." (*Ibid*.) Assembly Bill 1950 was meaningfully different. "Reduction in the maximum probation term under Assembly Bill 1950 … was effected by the Legislature directly and does not rely upon the trial court's exercise of its sentencing discretion." (*Ibid*.) Assembly Bill 1950 prohibited the sentence that was imposed. For that reason, we concluded that the remedy set out in *Stamps*—restoring the parties to the status quo ante with no apparent limitations on the maximum—was not appropriate for modifications required under Assembly Bill 1950. In *Flores*, the relief sought by the defendant was not beyond that which Assembly Bill 1950 afforded—reduction of the term of misdemeanor probation to one year. Because we concluded that the law directly affected a term of the plea agreement and undermined the bargain entirely (the defendant did not "repudiate his plea bargain"), depriving the defendant of the benefit of his plea agreement *and* depriving him of the benefit of Assembly Bill 1950 by restoring the parties to the status quo ante would run afoul of *Harris* and *Collins*. (*Flores*, at p. 450.) Assembly Bill 1950 prohibited the sentence imposed—a term of probation exceeding one year. Placing the defendant in a position where he could face prison based only on his receipt of the direct benefit of an ameliorative change in the law designed to lessen terms of probation would have flown in the face of the legislative intent. We therefore reduced the defendant's

term of probation to one year without permitting the trial court or the People an opportunity to withdraw approval for the plea agreement.

As discussed above, Senate Bill 567 does not merely grant trial courts new discretion or add additional considerations to the exercise of discretion. Senate Bill 567 limits a trial court's authority and requires it to make a new determination—whether, based on facts proved to a jury (or a court in a bench trial) or admitted by a defendant, the "circumstances in aggravation of the crime … justify the imposition of a term of imprisonment exceeding the middle term …." (§ 1170, subd. (b)(2).) That limitation on discretion was a purposeful response by the author of Senate Bill 567 to the previous broad discretion afforded to trial courts in selecting between the lower, middle, and upper terms that has "led to individuals serving maximum prison sentences without the opportunity to effectively refute alleged aggravating facts." (Assem. Com. on Public Safety, Rep. on Sen. Bill 567 (2021−2022 Reg. Sess.) as amended May 20, 2021, p. 3.) Senate Bill 567 reflected the Legislature's intent to ensure that "the harshest sentences receive the greatest scrutiny and justification before they are meted out." (*Ibid.*)

Where, as here, no finding was made that the circumstances in aggravation justify imposition of the upper term, the upper term may not be imposed.[5] The matter must be remanded for the trial court to make the required finding. We take no position on the appropriate finding.

If the trial court does not conclude that the admitted facts support the finding that circumstances in aggravation justify imposition of the upper term, the trial court may not impose the upper term which wholly undermines the plea agreement. As was the case in *Flores* and *Collins* (and unlike *Stamps*), the undermining of the plea agreement is the

---

[5]     We note that the People do not argue that the imposition of the upper term was harmless. No aggravating circumstances were found by the trial court or recommended by the probation officer. We do not consider whether the jury would have found any such circumstances true beyond a reasonable doubt.

23.

direct consequence of the ameliorative change in law; defendant did not repudiate the plea agreement. Unlike *Flores*, the only remedy available under the law is not to reduce the sentence without allowing withdrawal from the plea agreement. As noted in *Flores* and *Collins*, such is a " 'bounty in excess of that to which [defendant] is entitled.' " (*Flores*, *supra*, 77 Cal.App.5th at p. 451; *Collins*, *supra*, 21 Cal.3d at p. 215.) *Collins* is instructive regarding an appropriate remedy: restore the lost benefit of the bargain to the state by placing the parties in the pre-plea status quo, but preserve the benefit of the bargain to defendant by precluding a total sentence exceeding the sentence stipulated in the plea agreement. (*Collins*, at p. 216.) Such an outcome is consistent with the legislative intent of Senate Bill 567: to ensure that "the harshest sentences receive the greatest scrutiny and justification before they are meted out." (Assem. Com. on Public Safety, Rep. on Sen. Bill 567 (2021−2022 Reg. Sess.) as amended June 28, 2021, p. 3.)

## DISPOSITION

The sentence is vacated and the matter is remanded for resentencing in light of amended section 1170, subdivision (b). In all other respects, we affirm.